1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

Edwin Anthony Pellecier,                )
9                                         )      No. CV-05-159-TUC-FRZ-DTF
              Petitioner,                 )
10                                        )      **REPORT & RECOMMENDATION**
vs.                                       )
11                                        )
John Palosaari, et al.,                   )
12                                        )
              Respondents.                )
13                                        )
                                          )
14

Petitioner Edwin Anthony Pellecier has filed a Petition for Writ of Habeas Corpus
15
pursuant to 28 U.S.C. § 2254. Pursuant to the Rules of Practice of the Court, this matter was
16
referred to Magistrate Judge Ferraro for Report and Recommendation. Before the Court are
17
the Amended Petition and accompanying memorandum (Docs. 42, 43), Respondents'
18
Answer (Doc. 62), and Petitioner's Reply (Doc. 69). Petitioner also filed a motion for
19
evidentiary hearing, which is fully briefed. (Docs. 70-72.) The Magistrate Judge recommends
20
the District Court, after its independent review of the record, deny the motion and petition.
21
          **FACTUAL AND PROCEDURAL BACKGROUND**
22
Pellecier was indicted in the Pima County Superior Court for one count of first degree
23
murder for the death of James Williford, and three counts of aggravated assault as to Michael
24
Roman Gutierrez, Michelle Granillo and Gabriel Rascon. (Doc. 62, Ex. A.) He was convicted
25
on all counts and sentenced to 25 years to life for murder, and seven-and-one-half years on
26
each aggravated assault, consecutive to the murder sentence. (*Id.*, Ex. H at 22-23.)
27
Petitioner simultaneously appealed his conviction and sentence and filed a Petition
28
for Post-conviction Relief (PCR). (*Id.*, Exs. I, J.) The PCR court held an evidentiary hearing

on some of Petitioner's claims of ineffective assistance of counsel. (*Id.*, Exs. P-T.) The PCR court denied relief on all claims. (*Id.*, Exs. P, U.) Petitioner filed a petition for review of the denial of his PCR petition, which was consolidated with his direct appeal. (*Id.*, Exs. V, Y.) The Arizona Court of Appeals denied Petitioner's direct appeal and petition for review. (*Id.*, Ex. BB.) The Arizona Supreme Court denied Petitioner's petition for review on December 5, 2003. (*Id.*, Ex. EE.)

Petitioner filed a petition for federal habeas corpus relief on March 4, 2005. (Doc. 1.) He was granted a stay of the case in order to seek additional PCR relief for unexhausted claims contained in his petition. (Docs. 4, 8.) He filed a second PCR petition, which was denied. (Doc. 62, Exs. LL, OO, ZZ.) Petitioner sought review in the court of appeals. (*Id.*, Ex. HHH.) Review was granted but relief was denied. (*Id.*, Ex. III.) The Arizona Supreme Court denied review. (*Id.*, Exs. JJJ, KKK.) Petitioner filed an Amended Petition in this Court on July 29, 2010.

## DISCUSSION OF PETITION

Respondents contend that Claims 1-3 are procedurally defaulted and Claims 10-12 are outside the statute of limitations and untimely. The Court first addresses these procedural issues and then turns to the merits of Claims 4-9.

### STATUTE OF LIMITATIONS, CLAIMS 10 TO 12

The Antiterrorism and Effective Death Penalty Act (AEDPA) became effective on April 24, 1996. Under the AEDPA, federal petitions for writ of habeas corpus filed by state prisoners are governed by a one-year statute of limitations period. 28 U.S.C. § 2244(d)(1). The limitations period begins to run from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by

1    the Supreme Court and made retroactively applicable to cases on collateral
     review; or

2

3        (D) the date on which the factual predicate of the claim or claims
     presented could have been discovered through the exercise of due diligence.

4    *Id.*

5        **Timeliness**

6        In applying (d)(1)(A), the Court must assess when direct review of Petitioner's

7    convictions and sentences became final. The Arizona Supreme Court denied review on

8    Petitioner's direct appeal on December 5, 2003 (Doc. 62, Ex. EE), and his time to petition

9    for a writ of certiorari from the United States Supreme Court expired ninety days later, on

10   March 4, 2004, Sup. Ct. R. 13. Thus, the judgment against Petitioner became final on that

11   date. *See Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999) (holding that "direct review"

12   includes the period during which a petitioner can petition for writ of certiorari, regardless of

13   whether the petitioner seeks such review); *see also Jimenez v. Quarterman*, 555 U.S. 113,

14   119 (2009) (finding direct review to include the time up to the expiration of the period to

15   seek review by the Supreme Court). His one year to file his federal habeas petition ran on

16   March 4, 2005.

17       Pellecier filed a habeas petition on March 4, 2005. (Doc. 1.) That petition did not

18   include the grounds alleged in Claims 10-12 of the Amended Petition. (Docs. 1, 42.)

19   Petitioner concedes these grounds inadvertently were not included in the original petition and

20   are untimely. (Doc. 69 at 54.)

21       Federal Rule of Civil Procedure 15 provides, in relevant part, that an amended

22   pleading "relates back to the date of the original pleading when . . . (2) the claim or defense

23   asserted in the amended pleading arose out of the conduct, transaction, or occurrence set

24   forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). Claims

25   arise out of the same "conduct, transaction, or occurrence" when they are based on "a

26   common 'core of operative facts'"; they do not relate back if they arise out of "events

27   separate in 'both time and type' from the originally raised episodes." *Mayle v. Felix*, 545

28

1   U.S. 644, 657, 659 (2005).

2          Pellecier does not argue that Claims 10 to 12 relate back to his original petition. A

3   review of the original petition in entirety reveals that none of the claims therein share a

4   common core of operative facts with Claims 10 to 12. (Docs. 1, 42.) Thus, Claims 10 to 12

5   do not relate back to the original petition and they are untimely.

6          **Actual Innocence**

7          Pellecier argues the claims can still be considered because he presents a colorable

8   claim of actual innocence sufficient to overcome the time bar.[1] If a petitioner makes a

9   credible showing of actual innocence, a court may consider his time-barred claims on the

10  merits. *Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011). In evaluating such an allegation,

11  courts use the same standard they use to assess a petitioner's argument that because he is

12  actually innocent there will be a fundamental miscarriage of justice if any defaulted claims

13  are not considered on the merits. *Id.* at 938 (quoting *Schlup v. Delo*, 513 U.S. 298, 327

14  (1995)).

15         To demonstrate a fundamental miscarriage of justice based on factual innocence, the

16  petitioner must show that "a constitutional violation has probably resulted in the conviction

17  of one who is actually innocent." *Schlup*, 513 U.S. at 327. To establish the requisite

18  probability, the petitioner must show that "it is more likely than not that no reasonable juror

19  would have found petitioner guilty beyond a reasonable doubt." *Id*. The Supreme Court has

20  characterized the exacting nature of an actual innocence claim as follows:

21         [A] substantial claim that constitutional error has caused the conviction of an
           innocent person is extremely rare. . . . To be credible, such a claim requires
22         petitioner to support his allegations of constitutional error with new reliable
           evidence – whether it be exculpatory scientific evidence, trustworthy
23         eyewitness accounts, or critical physical evidence – that was not presented at
           trial. Because such evidence is obviously unavailable in the vast majority of
24         cases, claims of actual innocence are rarely successful.

25  ───────────────

26         [1]   Pellecier argues actual innocence as its own claim, Claim 8; however, he asserts it
       only as a gateway to any claims found defaulted or untimely. The Court does not evaluate
27     Claim 8 as an independent freestanding actual innocence claim. Rather, that briefing is
       considered with respect to actual innocence as a gateway to otherwise barred claims.
28

1    *Id.* at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006).

2    <u>Elements of the Crime and Justification Defenses</u>

3    The jurors were instructed that the defendant could be found guilty of first degree

4    murder based on a theory of premeditation upon proof beyond a reasonable doubt of the

5    following:

6        1.    The Defendant caused the death of another person; and

7        2.    The Defendant intended or knew that he would cause the death of
              another person; and

8        3.    The Defendant acted with premeditation.

9
10    "Premeditation" means that the Defendant acts with either the intention
      or the knowledge that he will kill another human being, when such intention
      or knowledge precedes the killing by a length of time to permit reflection. An
11    act is not done with premeditation if it is the instant effect of a sudden quarrel
      or heat of passion.

12
13    No appreciable length of time must elapse between the formation of the
      intent to kill and the act. They may be as instantaneous as successive thoughts
      of the mind. Premeditation requires actual reflection and it may be proved by
14    direct or circumstantial evidence.

15    (Doc. 62, Ex. F at 99.)

16    Because Petitioner asserted self-defense and defense of others, the jury was further

17    instructed that the killing could be found justified if he established the following by a

18    preponderance of the evidence:

19    A defendant is justified in using or threatening physical force in self-
      defense if the following two conditions existed:

20
21        1.    A reasonable person in the Defendant's situation would have
      believed that physical force was immediately necessary to protect against
      another's use or attempted use of unlawful physical force; and

22
23        2.    The Defendant used or threatened no more physical force than
      would have appeared necessary to a reasonable person in the Defendant's
      situation.

24
25    However, a person may use deadly physical force in self-defense only to
      protect against another's use or threatened use of deadly physical force.

26    Self-defense justifies the use or threat of physical force only while the
      apparent danger continues. The right to use physical force in self-defense ends
27    when the apparent danger ends.

28

- 5 -

. . . .

> That the Defendant's belief was honest is immaterial. You must measure the Defendant's belief against what a reasonable person would believe.

(*Id.* at 108-09.) The same standards apply to defense of others. (*Id.* at 109-10.)

Trial Evidence

In the early morning hours of March 1, 1998, Pellecier and Domingo Pacho were talking to three girls, Kedi Clement, Corina Ramos and Margaret Kortright, in a McDonald's parking lot on South Sixth Avenue in Tucson. A truck slowly passed through the lot twice. The truck was driven by James Williford, and he had three passengers, Michelle Granillo, Gabriel Rascon and Michael Roman Gutierrez. A short time later, Pellecier, in his car with Pacho as his passenger, left the parking lot with the girls following in their own car. Pellecier ended up behind the truck and he and the girls followed it, at a high speed, as it turned onto a side street. This street was estimated by Detective Mark Fuller to be 40 feet wide. (Doc. 62, Ex. C at 221.)

The critical disputed facts relate to what occurred after the cars turned onto the side street. All three of the truck's passengers, Granillo, Rascon and Gutierrez, testified that Pellecier passed the truck by five to twenty feet and parked partly in the truck's lane, blocking it from passing. (*Id.*, Ex. B at 176-79, 192, 200, 208, Ex. C at 32, 46, 60, 63-64, 83.) Pacho and the three girls in Clement's car stated that Pellecier passed the truck, they both stopped, and he parked at least four or five feet in front of it on the left side of the road, not blocking the truck. (*Id.*, Ex. C at 151-52, 155, 180, 193, Ex. E at 59, 61, 102-03, 118, 140, 167-68.) Pellecier testified that he was following the truck, which slammed on its brakes, and he veered off to the left side and they both stopped. (*Id.*, Ex. E at 201, 234.)

Pellecier testified that he got out of the car thinking they were going to have a fistfight and he was challenging them to fight. (*Id.* at 203, 241.) Granillo stated that Pellecier had a gun in his hand when he stepped out of his car. (*Id.*, Ex. B at 179.) Rascon and Gutierrez saw something in Pellecier's hand when he got out of the car but couldn't identify what it was. (*Id.*, Ex. C at 34, 86.) Rascon testified that Williford and Gutierrez got out of the truck and

- 6 -

1    got back in stating that Pellecier had a gun. (*Id.* at 35-36.) None of the witnesses in Clement's

2    car saw a gun in Pellecier's hand when he initially got out of the car. (*Id.*, Ex. E at 59, 103,

3    173.)

4          When Pacho got out of the car he testified that he walked to its rear and Pellecier was

5    at the left side rear of the truck. (*Id.*, Ex. C at 155-56.) Pacho saw one of the truck passengers

6    get out holding his pants, so he yelled, he's got a gun. (*Id.* at 184.) Pellecier stated that when

7    Gutierrez got out of the truck, he lifted his shirt and reached into his pants, and Pacho yelled

8    that he had a gun about three times. (*Id.*, Ex. E at 204.)

9          Gutierrez told Williford to "hit them dudes," or "run them over," because he believed

10   Pellecier had a gun pointed at them. (*Id.*, Ex. C at 35, 55, 87, 88.) Granillo testified that

11   Pellecier was never in a location where the truck could have hit him (*Id.*, Ex. B at 192) and

12   Rascon confirmed that Pellecier was never in front of the truck and Williford never tried to

13   hit him with the truck (*Id.*, Ex. C at 47, 48). Rascon stated that Williford hit Pellecier's car

14   in order to get away. (*Id.* at 36-37, 55.) Granillo testified that Pellecier immediately came

15   towards the left side of the truck and started shooting and she felt them crash into Pellecier's

16   car. (*Id.*, Ex. B at 182-84, 185-86.) Gutierrez stated that Williford reversed the truck after

17   hitting the car. (*Id.*, Ex. C at 88-90, 94.)

18         Pacho testified that when the truck hit the car it missed him by inches. (*Id.* at 155-56,

19   157.) Pellecier thought the truck was trying to hit both of them. (*Id.*, Ex. E at 205, 239.) The

20   three girls in Clement's car all testified that the truck nearly hit Pellecier, causing him to

21   jump out of the way, and then reversed. (*Id.* at 60, 102-03, 142.) Pacho and Pellecier stated

22   that the truck reversed and rammed into the car a second time pushing it forward. (*Id.*, Ex.

23   C at 156, Ex. E at 206, 245.) After the truck backed up, Kortright heard Pacho yell, "Get the

24   gun, get the gun." (*Id.*, Ex. E at 103, 122, 123, 133.)

25         Two experts in accident reconstruction agreed that the truck was traveling eight to ten

26   miles per hour when it struck the car. (*Id.*, Ex. C at 259, Ex. D at 126.) Detective Marty

27   Fuentes noted that there was not a lot of overlap, indicating only one collision. (*Id.*, Ex. C at

28

258.) Raymond Morgan testified that the truck was seven to eighteen feet away from the car before it began to accelerate into the collision and there could have been a very low speed second impact, a "double kiss." (*Id.*, Ex. D at 128, 131, 132, 133-34.)

Rascon and Gutierrez saw Pellecier at the left rear of the truck after they hit the car, and then they heard shots from the left rear and then straight out to the side. (*Id.*, Ex. C at 38-40, 93.) All three of the girls in Clement's car corroborated Pellecier's testimony that, after Williford hit the car, Pellecier returned to his car and got his gun. (*Id.*, Ex. E at 61, 103, 173.) Pellecier testified that he was afraid the truck was going to try and hit them again and they would be shot, because he feared for his life he got his gun from the car. (*Id.* at 206.) Pellecier testified he was on the side of the truck, not in the back, when he fired his gun. (*Id.* at 250.) The three girls were in agreement that Pellecier was not to the rear of the truck when he fired the gun, but to the front and side. (*Id.* at 85, 103, 175.) Further, the truck could not have hit him at that time. (*Id.* at 86, 126.) Pellecier clarified that once he got his gun, he wasn't really worried about getting hit by the truck. (*Id.* at 249.) Pacho testified that Pellecier told him, after the fact, that he fired his gun because he thought someone in the truck was armed. (*Id.*, Ex. C at 184.)

Williford was killed by a single bullet that entered his left shoulder. A second bullet passed through Granillo's jacket and lodged in Rascon's back. Pellecier and Pacho drove away from the scene after the shooting. Detective James Fillipelli testified that there was a bullet hole in the truck by the driver's side door post, and he found a bullet inside the truck in that area. (*Id.*, Ex. D at 56-57.) Detective Fillipelli stated that to him it appeared obvious, from a review of the photographs of the hole, that the direction of travel for that bullet was from the rear of the truck towards the front, that the shooter was behind the driver. (*Id.* at 57, 61, Ex. E at 287, Ex. F at 8.)

New Evidence

Richard Watkins, from the Forensic Science Laboratory, opined that the bullet hole in the truck was probably, to a reasonable degree of scientific certainty, fired from a position

to the side or slightly behind the strike point. (Doc. 43, Ex. A.) Gary M. Bakken, a human factors expert from Analytica Systems International, Inc., analyzed Pellecier's firing of the three shots. Based on the assumptions that the three shots were fired with equal minimum time durations between shots, Pellecier's starting position was perpendicular to the driver's door, and the truck was reversing during the shooting, Bakken concluded that Pellecier could not have started at the rear of the truck. (*Id.*, Ex. B.) Donald L. Barton, an expert marksman, concluded all three shots were likely fired from a stationary position perpendicular to the driver's door. (*Id.*, Ex. C.) Andrew Sowards of Inter-State Investigative Services Inc. conducted vehicle tests, with the truck behind the car four feet and to the left as far as possible given the dent in the car; based on that scenario the truck was able to turn and clear the rear of the car. (*Id.*, Ex. D.)

Analysis

Pellecier argues that his new evidence undermines the State's case and establishes his self-defense claim. He contends that Williford intentionally rammed his car, putting Pellecier and Pacho in danger, when he could have driven away. Further, Pellecier shot only from the side not the rear of the truck.

The Court must assess whether, more likely than not, a single reasonable juror could have found that Pellecier premeditated or was not justified in his use of force. There are three inquiries within this issue: whether the shooting was premeditated; whether the use of deadly force was justified because of the victim's use and/or threatened use of force by way of the truck; whether the use of deadly force was justified because of threatened use of force by way of a gun.

Pellecier contends there was little evidence of premeditation, rather, the shooting was a response to the assault by Williford's truck. Petitioner contends the evidence suggests at most second degree murder or manslaughter not first degree premeditated. The thrust of Pellecier's arguments are really aimed at the sufficiency of the evidence at trial for

premeditation.[2] For example, he contends that "events were rapidly unfolding in the street," and the jury would not have found premeditation if they had known that he did not fire his gun from behind the truck and that the truck was not trapped by Pellecier's car.[3] The new evidence has no bearing on the timing or order of events, the various versions of which were addressed by witnesses at trial. Further, Pellecier's own testimony undermines the theory that there was no premeditation due to the rapidity of the events – he stated that he returned to his car to retrieve his gun and then fired the shots.

Pellecier also argues that the only evidence to support premeditation was a prior argument between Williford and Pellecier, from which one witness surmised that Pellecier threatened to shoot Williford. Although that prior argument was suggested as a motive, premeditation does not require that kind of advance planning. The Arizona Supreme Court relied on two facts to support premeditation: Pacho's testimony that Pellecier stated he was going to get Williford while he pursued him in his car, and Pellecier's testimony that he intentionally retrieved his gun and fired it at the truck. (Doc. 62, Ex. Z at 9-10.) A reasonable juror could conclude that Pellecier reflected upon the killing after Williford struck Pellecier's car and before he fired the gun, during the time he returned to his car to retrieve the weapon. Alternatively, a reasonable juror could have discounted Pellecier's testimony and believed that he had his gun in his hand when he exited his car, which also supports a finding of

---

[2]   This point is highlighted by the fact that Petitioner relies solely on his fundamental miscarriage of justice arguments to support his sufficiency of the evidence claim. (Doc. 42 at 50.)

[3]   To the extent the prosecutor focused on Williford's truck being blocked and Pellecier standing behind the truck, it appears that this evidence was most relevant to the felony murder charge against Pellecier. The prosecutor argued that Pellecier kidnapped or attempted to kidnap the people in the truck and during the course of that felony someone was killed. To find kidnapping, the jury had to determine that Williford was restrained through physical force, intimidation or deception, and Pellecier had the intent to inflict physical injury or death, or place the victim in apprehension of physical injury. (Doc. 62, Ex. F at 99-100.) Thus, the prosecutor argued that Pellecier blocked Williford's truck in the front and stood behind the truck with a gun, preventing him from leaving. (*Id.* at 24-27.) This evidence is less critical because Pellecier was not convicted of felony murder.

premeditation. These possibilities remain unchanged by the new evidence.

Next, the Court assesses whether Pellecier had a viable self defense or defense of others. As an initial matter, if a defendant provoked the use of physical force, self-defense is not available unless the defendant withdraws or communicates an intent to withdraw (with a reasonable belief that it is unsafe to do so). (Doc. 62, Ex. F at 111.) As mentioned above, a juror could reasonably believe that Defendant exited his car with his gun, as testified to by passengers in Williford's truck, and did not withdraw from that engagement. If a juror reached that conclusion, self defense would not be viable. However, below, the Court considers Petitioner's defenses relying upon his trial testimony.

The Court first assesses the reasonableness of Pellecier's use of force in response to the use or threatened use of force from the truck. The evidence of the ramming of the car is, in most part, not new. Numerous witnesses testified that the truck was not blocked and Williford intentionally rammed the car. Even one of the truck passengers, Gutierrez, testified that he encouraged Williford to try to hit them. There is now additional evidence indicating the truck was not blocked. However, even if the truck could have cleared the rear of the car, the evidence doesn't clearly demonstrate there was room for the truck to drive by on the right or left, especially with Pellecier and Pacho in the roadway.

More importantly, even if Williford could have driven away and the striking of Pellecier's car was intentional and put Pellecier and Pacho at risk, it does not solidify his self defense or defense of others claim. All of the testimony established that, after the truck hit the car a first time, neither Pellecier nor Pacho were in danger of being struck by the truck.[4] Assuming Pellecier was to the side of the truck, not the rear, he was not in range of being struck. Pellecier confirmed that, after the first hit, when he picked up his gun, he was not in fear of being hit by the truck. Because the apparent danger from the truck was over, Pellecier was not justified in using deadly force on that basis.

---

[4]     Pellecier testified that he jumped to the side of the truck to avoid being struck by Williford. (Doc. 62, Ex. E at 205, 244.)

The remaining question is whether Pellecier was justified in the use of force based on the threatened use of a gun. No new evidence bears directly on this question. As discussed below in Claim 9, there was sufficient evidence presented at trial to allow a reasonable juror to reject the justification defenses related to the possible presence of a weapon in the truck. The new evidence, confirming that Pellecier stood to the side of the truck when firing all three shots, is potentially relevant only to bolster the credibility of Pellecier and the three women in the other car. However, if a juror believed their testimony in entirety, that his car was not blocking the truck, he did not have a gun in his hand when he exited his car, he believed someone in the truck was armed, Williford tried to strike him and/or Pacho with the truck, Williford hit the car twice, and Pellecier fired his weapon from the side of the truck, it would not require accepting his justification defenses.

A reasonable juror could conclude that a reasonable person would not have believed deadly force was immediately necessary due to the possible presence of a weapon in the truck. Whether Pellecier actually believed his conduct was justified is irrelevant, the Court assesses only what a reasonable person would conclude under the circumstances. A reasonable juror could have believed Defendant had his gun with him when he first exited the car and that he fired without any threat from another person's weapon. Alternatively, adopting Pellecier's testimony, his actions diminish the possibility of an immediate threat because he did not retrieve his gun as soon as he heard one of the truck passengers might be armed but only after his car was struck. Neither Pellecier nor Pacho actually saw a weapon, they guessed that one of the passengers was armed. That person, Gutierrez, quickly got back in the truck. Most importantly, no one from the truck brandished or discharged a weapon or threatened to do so. All a reasonable person could have believed was that a passenger, seated at least two people away from the driver's side of the truck, might have possessed a weapon. It is not unreasonable to conclude that the use of deadly force directed at the driver was not immediately necessary.

**Conclusion**

Assessing all the evidence, that presented at trial and developed since trial, it is more likely than not that a reasonable juror could have found Pellecier guilty of premeditated murder and that his use of force was not justified. Because Pellecier has not established actual innocence, Claims 10 to 12 are barred by the statute of limitations.

**PROCEDURAL DEFAULT, CLAIMS 1 TO 3**

Respondents argue Claims 1 to 3 were presented for the first time in Pellecier's second PCR proceeding and found precluded because they were previously adjudicated. Therefore, they contend they are procedurally defaulted.

**Principles of Exhaustion and Procedural Default**

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

1      A habeas petitioner's claims may be precluded from federal review in two ways.

2  First, a claim may be procedurally defaulted in federal court if it was actually raised in state

3  court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S.

4  at 729-30.  Second, a claim may be procedurally defaulted if the petitioner failed to present

5  it in state court and "the court to which the petitioner would be required to present his claims

6  in order to meet the exhaustion requirement would now find the claims procedurally barred."

7  *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998)

8  (stating that the district court must consider whether the claim could be pursued by any

9  presently available state remedy).  If no remedies are currently available pursuant to Rule 32,

10  the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732,

11  735 n.1; *see also Gray*, 518 U.S. at 161-62.

12      Because the doctrine of procedural default is based on comity, not jurisdiction, federal

13  courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

14  468 U.S. 1, 9 (1984).  However, the Court will not review the merits of a procedurally

15  defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly

16  exhaust the claim in state court and prejudice from the alleged constitutional violation, or

17  shows that a fundamental miscarriage of justice would result if the claim were not heard on

18  the merits in federal court. *Coleman*, 501 U.S. at 750.

19              **Procedural Default Analysis**

20      In Claim 1, Pellecier argues that he received ineffective assistance of counsel (IAC)

21  at trial because counsel failed to interview Detective Fillipelli, investigate the ballistics

22  evidence, and move for exclusion of the detective's ballistics testimony. In Claim 3, Pellecier

23  argues the State engaged in prosecutorial misconduct, which violated his right to due process,

24  by failing to disclose evidence regarding the bullet trajectory prior to trial. He contends this

25  was an intentional violation of the disclosure rules and the prosecutor used this false evidence

26  at trial to convict Petitioner. Additionally, Pellecier argues the State blocked efforts to obtain

27  discovery about this claim during Petitioner's second post-conviction proceeding.

28

In Claim 2, Pellecier argues that newly discovered evidence supports the allegations of IAC and prosecutorial misconduct set forth in Claims 1 and 3. Claim 2 does not allege an independent constitutional violation cognizable in a federal habeas petition. Although newly discovered facts are a recognized ground for relief in an Arizona PCR proceeding, Ariz. R. Crim. P. 32.1(e), it does not state a claim before this Court. Therefore, the Court assesses the newly discovered evidence as to Claims 1 and 3, and as relevant to Pellecier's arguments to overcome any bars applicable to his claims.

Claim 1

In his first PCR proceeding, Pellecier argued that counsel was ineffective for failing to interview Detective Fillipelli and to investigate the ballistics evidence.[5] (Doc. 62, Ex. M at 16-20.) During the hearing, evidence was presented about counsel's failure to move to exclude the detective's "expert" testimony. (*Id.*, Ex. Q at 85, Ex. T at 32-33.)

The PCR court found that Pellecier had not established prejudice as to this claim. (*Id.*, Ex. U at 4.) The court found that Detective Fillipelli did not testify as an expert on ballistics; rather, he provided his opinion based on personal observation. (*Id.*) The appellate court did not rule on whether Fillipelli testified as an expert; rather, it found that Pellecier was not prejudiced because the trial court was not reasonably likely to preclude the testimony nor was it reasonably likely that the verdict would have been different if the testimony had been excluded. (*Id.*, Ex. BB at 16.)

Pellecier argues that the state courts failed to rule on his argument that counsel was ineffective for failing to investigate the ballistics evidence, separate from his claim that counsel failed to get Detective Fillipelli's ballistics testimony excluded; thus, he contends this portion of the claim should be evaluated de novo. The Court disagrees. Pellecier framed this issue in his PCR petition as several errors by counsel all revolving around his failure to investigate and understand the state's theory regarding the ballistics evidence. The PCR court

---

[5]   Respondents erroneously argue that this claim was not raised until the second PCR proceeding. (Doc. 62 at 25-26.)

1    framed the issue as, "Petitioner asserts that trial counsel was ineffective for failing to

2    investigate the bullet trajectories." (*Id.*, Ex. U at 4.) The PCR court noted that Pellecier had

3    told his counsel where he was standing and choosing not to conduct an investigation that

4    might have been fruitless or harmful, based on information from a defendant, is not

5    unreasonable. (*Id.*) Further, when relief is denied by a state court, this Court must presume

6    the claim was adjudicated on the merits, in the absence of any contrary indication.

7    *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (requiring AEDPA deference even

8    when a claim or a whole petition is summarily denied). Here, the PCR court acknowledged

9    the breadth of the claim before ruling on it.

10        In his second PCR proceeding, Pellecier argued that counsel was ineffective because

11   he failed to interview Detective Fillipelli prior to trial, consult experts before trial, and to

12   seek a mistrial based on the surprise testimony by Detective Fillipelli. (Doc. 62, Ex. LL at

13   21.) The PCR court found this claim precluded because it was previously adjudicated in the

14   first PCR proceeding. (*Id.*, Ex. OO at 3.) To the extent Pellecier produced new evidence, the

15   PCR court found that he failed to show due diligence in obtaining the evidence, which he did

16   not demonstrate was unavailable at trial or in his first PCR proceeding. (*Id.* at 4.) Further, the

17   court concluded that Pellecier failed to show that the new evidence would have changed the

18   verdict. (*Id.*) In particular, the PCR court found that even if the jury believed that Pellecier

19   fired all three shots from the side of the truck, rather than one from behind, it did not bolster

20   his self-defense claim because his location at the side of the truck did not put him at risk of

21   being struck by the truck. (*Id.*) The appellate court adopted the PCR court's rulings. (*Id.*, Ex.

22   III at 4.)

23        There is no question the claim as presented in the first PCR petition (and reiterated

24   in the second) was addressed on the merits.[6] As the PCR ruled when this claim was raised

25   _____

26        [6]   The Court notes that close review of Petitioner's petition for review from the denial
     of his first PCR reveals that he did not raise all aspects of the claim on appeal. (Doc. 62, Ex.

27   X.) He argued only that trial counsel failed to interview Detective Fillipelli and failed to have
     his ballistics testimony precluded. (*Id.* at 10, 11, 16-19.) He did not argue that counsel should

28

in the second petition, claims raised in a prior proceeding are precluded from being raised in a Rule 32 petition based on Arizona Rule of Criminal Procedure 32.2(a)(2). However, as explained by the Ninth Circuit, they are not barred from review in federal court:

> A claim that has been found to be "precluded" under subsection (a)(2) appears to be a classic exhausted claim and may therefore be subject to consideration in federal habeas. *See Ceja v. Stewart*, 97 F.3d 1246, 1252-53 (9th Cir.1996) (recognizing the distinction between waiver and preclusion, and holding that "[p]reclusion does not provide a basis for federal courts to apply a procedural bar").

*Poland v. Stewart*, 169 F.3d 573, 578 (9th Cir. 1999).

In contrast, the state court dismissed the new evidence presented in the second PCR proceeding on a procedural ground, because it did not meet an exception to state court preclusion. Because the state court refused to consider this new evidence on a procedural ground, it is not properly exhausted for review in this Court. Further, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). Because the state court did not consider the evidence presented in the second PCR petition, this Court cannot consider it when evaluating the merits under (d)(1). Thus, this part of the claim is technically exhausted but procedurally defaulted.[7]

Regardless of exhaustion, the Court considers the claim and all the supporting

---

have conducted pretrial investigation of the bullet trajectories. This procedural default argument was not raised by Respondents. The Court does not rely on Petitioner's failure to fairly present this part of the claim on appeal because the Court finds below that the claim lacks merit, regardless of exhaustion.

[7]   Pellecier argues that to the extent any claims are found barred by operation of Arizona law, the state's postconviction procedures are unconstitutional. Alleged errors in the postconviction process are not cognizable in a federal habeas corpus proceeding because they do not attack the lawfulness of Petitioner's detention. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam) (finding allegations of error in state post-conviction review process non-cognizable); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997). Pellecier relies on *District Attorney's Office for the Third Judicial District v. Osborne*, 129 S.Ct. at 2320; however, that is a § 1983 case not a habeas proceeding.

1    evidence below and finds it should be dismissed on the merits. *See* 28 U.S.C. § 2254(b)(2)

2    (allowing denial of unexhausted claims on the merits); *see also Rhines v. Weber*, 544 U.S.

3    269, 277 (2005).

4         Claim 3

5         Claim 3 – alleging prosecutorial misconduct for failing to disclose ballistics evidence

6    and for using false evidence at trial – was not raised in Pellecier's first PCR petition,

7    although he argued prosecutorial misconduct during cross-examination of Pellecier and

8    closing arguments (Claim 12 of the Amended Petition). (Doc. 62, Doc. M.) As acknowledged

9    by Respondents in their answer (Doc. 62 at 25-26), Pellecier raised this claim for the first

10   time in his second PCR Petition (*Id.*, Ex. LL). The PCR court found the claim precluded

11   because it was raised in his first PCR petition. (*Id.*, Ex. OO at 3.)

12        The PCR court's ruling was erroneous. More importantly, as discussed above, a ruling

13   that a claim was previously adjudicated, pursuant to Arizona Rule of Criminal Procedure

14   32.2(a)(2), is not a bar to federal review. *See Ceja*, 97 F.3d at 1253 ("Preclusion does not

15   provide a basis for federal courts to apply a procedural bar."); *Pirtle v. Morgan*, 313 F.3d

16   1160, 1168 (9th Cir. 2002) (denial of a claim based on a state rule precluding "relitigation"

17   not a bar to federal review because it is not a merits ruling or a denial on a procedural

18   ground) (citing *Ylst v. Nunnemaker*, 501 U.S. 797 (1991)). Therefore, the PCR court's

19   finding of preclusion does not prevent review of the claim on the merits in this court.

20   Because Pellecier fairly presented this claim but there is no state court ruling on the merits,

21   this Court reviews it de novo. *Williams v. Cavazos*, 646 F.3d 626, 637 (9th Cir. 2011)

22   (quoting *Cone v. Bell*, 556 U.S. 449 (2009)); *Pirtle*, 313 F.3d at 1167.

23        Conclusion

24        Claim 1 is exhausted in part and procedurally defaulted in part. The Court finds it

25   most expeditious to address the entirety of the claim on the merits. Claim 3 was fairly

26   presented in state court and it was not dismissed on a procedural ground preventing review

27   in this Court. Therefore, it is reviewed de novo.

28

1
2
3
4
5
6
7
8
9

**MERITS**[8]

**Legal Standard for Relief Under the AEDPA**

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

10
11

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

12
13

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14
15

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16
17
18
19

28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

20
21
22
23
24

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

25
26
27
28

---

[8]   Because Respondents erroneously concluded that Claims 1 and 3 were procedurally defaulted, they chose not to provide merits briefing on these claims. They were provided an opportunity to address the merits, therefore, the Court does not find additional briefing warranted. Further, the Court can resolve the claims based on the information currently before it.

of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable," the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 550 U.S. at 473; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual

1    determination will not be overturned on factual grounds unless objectively unreasonable in

2    light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340

3    (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In

4    considering a challenge under § 2254(d)(2), state court factual determinations are presumed

5    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

6    convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*,

7    545 U.S. at 240.

8                      **Standard for Ineffective Assistance of Counsel Claims**

9            The governing federal standard for claims of ineffective assistance of counsel is set

10   forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), which recognizes a right to

11   "effective assistance of counsel" arising under the Sixth Amendment. The *Strickland*

12   standard for IAC has two components. A defendant must first demonstrate that counsel's

13   performance was deficient, *i.e.*, that counsel made errors so serious that counsel was not

14   functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. 466 U.S. at

15   687. It requires the defendant to show that counsel's conduct "fell below an objective

16   standard of reasonableness." *Id.* at 687-88. Counsel's performance is strongly presumed to

17   fall within the ambit of reasonable conduct unless petitioner can show otherwise. *Id.* at 689-

18   90. Second, a defendant must show that the mistakes made were "prejudicial to the defense,"

19   that is, the mistakes created a "reasonable probability that, but for [the] unprofessional errors,

20   the result of the proceeding would have been different."  *Id.* at 694. A court need not address

21   both prongs of an ineffectiveness claim, if it is easier to dispose of it solely by assessing

22   prejudice, the court is free to do so. *Id.* at 697.

23           **Claim 1**

24           Pellecier argues that he received IAC at trial because counsel failed to interview

25   Detective Fillipelli, investigate the ballistics evidence, and move for exclusion of the

26   detective's ballistics testimony.

27           This claim fails because Pellecier cannot establish prejudice. For the reasons

28

1   articulated more thoroughly in the actual innocence analysis above, considering all of the

2   new evidence, there is not a reasonable probability that Pellecier would not have been

3   convicted of first degree murder if counsel had investigated the ballistics evidence. Even if

4   the jury heard and believed conclusive evidence that Pellecier was at the side of the truck

5   when he fired all three shots, it does not undermine the finding of premeditation or the

6   rejection of his justification defenses. Nor would the bolstering of the witnesses' credibility

7   have created a reasonable probability of a different verdict. Pacho testified that Pellecier

8   stated he was going to get Williford, and Pellecier confirmed that he took the time to return

9   to his car to retrieve his gun before shooting. Further, as noted by the PCR court in ruling on

10  Pellecier's second PCR proceeding, Pellecier's position at the side of the truck precluded him

11  from being struck by the truck at the time he fired his weapon. No one in the truck had

12  threatened Pellecier or Pacho with a weapon. Thus, the immediate use of force was not

13  necessary.

14        Claim 1 fails on the merits.

15  **Claim 3**

16        Pellecier argues the State engaged in prosecutorial misconduct, which violated his

17  right to due process, by failing to disclose evidence regarding the bullet trajectory prior to

18  trial. He contends this was an intentional violation of the disclosure rules and the prosecutor

19  used this false evidence at trial to convict Petitioner. Additionally, Pellecier argues the State

20  blocked efforts to obtain discovery about this claim during Petitioner's second post-

21  conviction proceeding.

22        To the extent Pellecier is complaining about the State's actions in the second PCR

23  proceeding, the claim is not exhausted nor cognizable. Alleged errors in the postconviction

24  process are not cognizable in a federal habeas corpus proceeding because they do not attack

25  the lawfulness of Petitioner's detention. *See Franzen*, 877 F.2d at 26 (finding allegations of

26  error in state post-conviction review process non-cognizable); *Gerlaugh*, 129 F.3d at 1045.

27  Further, Petitioner has not raised this issue before the state court, thus, it is unexhausted.

28

1    Pellecier acknowledges that it is not unconstitutional to convict a defendant with

2 "surprise" evidence. The focus of his claim is that the prosecution used false evidence to

3 convict him. In *Napue v. Illinois*, the Supreme Court held that the knowing use of false

4 evidence by the state, or the failure to correct false evidence, violates due process.  360 U.S.

5 264, 269 (1959). To prevail on a *Napue* claim, the petitioner must show that (1) the testimony

6 was actually false, (2) the prosecution knew or should have known that the testimony was

7 actually false, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984

8 (9th Cir. 2005) (en banc).

9    A habeas petitioner must show that a witness's statement was "indisputably false."

10 *Byrd v. Collins*, 209 F.3d 486, 617 (6th Cir. 2000). Pellecier has not made that showing with

11 respect to Detective Fillipelli's opinion. He has demonstrated only that his experts disagree

12 with Detective Fillipelli that one bullet was fired from behind the truck. The fact that an

13 expert disagrees with the testimony and opinions offered by a State witness is not sufficient

14 to demonstrate that the latter testified falsely. *See Harris v. Vasquez*, 949 F.2d 1497, 1524

15 (9th Cir. 1990) ("conflicting psychiatric opinions do not show that [an expert's] testimony

16 was false"); *Lambert v. Blackwell*, 387 F.3d 210, 249 (3rd Cir. 2004) (perjury is only one

17 possible explanation for inconsistent testimony); *Fuller v. Johnson,* 114 F.3d 491, 496-97

18 (5th Cir. 1997) (finding that disagreement over a witness's opinion or conclusion does not

19 prove the testimony "false"; rather, it should be the subject of cross examination).

20    Although Petitioner's failure to demonstrate that Detective Fillipelli testified falsely

21 necessarily defeats any allegation that the State knew of the alleged perjury, the Court also

22 notes that Petitioner has no evidence demonstrating that the State was aware that the

23 detective's testimony about the bullet trajectory was inaccurate, let alone false. Therefore,

24 his claim would fail even if he could demonstrate that Fillipelli's testimony was inaccurate.

25 *See Briscoe v. LaHue*, 460 U.S. 325, 326 n.1 (1983) ("The Court has held that the

26 prosecutor's knowing use of perjured testimony violates due process, but has not held that

27 the false testimony of a police officer in itself violates constitutional rights."). Pellecier

28

1  argues that he does not know the State's level of culpability because he has been unable to

2  conduct discovery. Discovery on this point would be no more than a fishing expedition.

3  There is absolutely no evidence suggesting the prosecutor knew or should have known the

4  detective's testimony was false.

5      For the purpose of *Napue* claims, materiality is determined by whether there is any

6  reasonable likelihood that the false testimony could have affected the judgment of the jury,

7  "in which case the conviction must be set aside." *Belmontes v. Brown*, 414 F.3d 1094, 1115

8  (9th Cir. 2005) (quoting *Agurs*, 427 U.S. at 103 (1976)). "Under this materiality standard,

9  [t]he question is not whether the defendant would more likely than not have received a

10  different verdict with the evidence, but whether in its absence he received a fair trial,

11  understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984

12  (internal quotation omitted). The Court assesses whether the verdict is worthy of confidence

13  despite the jury not hearing evidence confirming Pellecier's testimony that he fired all three

14  shots from the side of the truck. For all the reasons discussed thoroughly above with respect

15  to fundamental miscarriage of justice, there is not a reasonable likelihood that the alleged

16  false testimony affected the verdict and the Court finds the verdict worthy of confidence.

17  Even if the jury believed all of Pellecier's testimony, there was ample evidence of

18  premeditation and lack of justification.

19      Pellecier fails to satisfy the *Napue* standard; thus, Claim 3 should be dismissed on the

20  merits.

21      **Claim 4**

22      Pellecier argues his right to effective assistance of counsel under the Sixth

23  Amendment was violated on appeal because his counsel failed to understand and investigate

24  the bullet trajectory evidence presented at trial. Petitioner raised this claim in his second PCR

25  proceeding. (Doc. 62, Ex. LL at 22.) The court noted that the same counsel represented

26  Pellecier on his direct appeal and first PCR proceeding. (*Id.*, Ex. OO at 5 n.2.) The court

27  found that the ballistics issue was raised during the first PCR proceeding, not on appeal, thus,

28

the allegation is relevant to his post-conviction not appellate representation. (*Id.*) The court went on to conclude that because there is no constitutional right to effective assistance during postconviction proceedings, the claim failed as a matter of law. (*Id.*)

Pellecier contends that he asked his counsel to investigate this issue prior to counsel filing the appellate brief or PCR petition, and at that time he was entitled to effective assistance of counsel.[9] The Court disagrees. The issue regarding bullet trajectory was raised in the PCR proceeding because it required extra-record evidence, which is not allowed on appeal. *See State v. Cabrera*, 560 P.2d 417, 420, 114 Ariz. 233, 236 (1977) (noting that Rule 32 provides a remedy for claims not resolvable on appeal because there is an insufficient factual basis in the record); Ariz. R. Crim. P. 31.13(c)(1)(iv). Thus, Petitioner can only obtain relief if he was constitutionally entitled to effective assistance of counsel during his PCR proceeding.

The Supreme Court has not decided whether a petitioner has a constitutional right to effective assistance of counsel during an initial PCR proceeding when that is the first opportunity to raise ineffective assistance of counsel. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012). Because the Supreme Court has not spoken on this point, the state court's ruling is not contrary to clearly established federal law and Pellecier cannot obtain relief on the claim. *See Musladin*, 549 U.S. at 654. Even if Pellecier were entitled to effective assistance during his PCR proceeding, he cannot establish prejudice for the same reasons underlying the denial of Claim 1. Because Petitioner was not prejudiced by trial counsel's failure to investigate the bullet trajectory evidence, the Court similarly concludes that Pellecier was not prejudiced by his PCR counsel's failure to conduct that investigation. Claim 4 is without merit.

---

[9] Pellecier contends that if this claim is precluded due to Arizona law, then he asserts that those post-conviction procedures violate the constitution. Alleged errors in the postconviction process are not cognizable in a federal habeas corpus proceeding because they do not attack the lawfulness of Petitioner's detention. *See Franzen*, 877 F.2d at 26 (finding allegations of error in state post-conviction review process non-cognizable); *Gerlaugh*, 129 F.3d at 1045.

**Claim 5**

Pellecier contends his right to effective assistance of counsel at trial was violated by counsel's failure to investigate the prosecution's evidence of motive relating to a prior argument between Pellecier and Williford. In particular, he asserts counsel should have interviewed State witness Miriam Madrid and interviewed, and presented the testimony of, witness Emilia Gonzales. The PCR court found that the testimony of Gonzales would have been cumulative of that provided by Petitioner and his mother, therefore, he failed to establish prejudice. (Doc. 62, Ex. U at 3.)

Madrid, Williford's girlfriend at the time, testified to overhearing Williford arguing with Pellecier on the phone in 2007; Williford had called Pellecier in response to a page from Pellecier to Madrid. (*Id.*, Ex. C at 121-22.) Madrid heard Williford say, "how come he can't fight," and she thought that was in response to Pellecier stating that he was going to shoot Williford. (*Id.* at 122.) Williford did not tell her what Pellecier said, rather she testified that she made a guess from the context. (*Id.* at 135.)

First, Pellecier contends counsel should have interviewed Madrid about the basis for her guess regarding the conversation she overheard. Counsel brought out on cross-examination that Madrid did not hear what was said nor did Williford tell her, and that she had guessed at what was said. Thus, the jury was provided the relevant information.

Second, Pellecier contends his counsel should have presented the testimony of Gonzales, who was present with him during the conversation. She would have reported that Pellecier did not threaten to shoot Williford but told him, "why do you have to be hating," and "why do you have to bring this to my house."[10]

There is no dispute that an unfriendly conversation occurred between Pellecier and Williford months prior to the murder. Madrid testified that Williford was angry in the

---

[10]   The Court was unable to locate Gonzales's affidavit that was attached to Petitioner's PCR petition. There are no exhibits attached to the copy of the petition provided by Respondents nor does it appear that Petitioner provided it. The Court adopts Petitioner's representation of its contents.

conversation. (*Id.* at 134.) In argument, the prosecutor did not focus on whether Pellecier threatened to shoot Williford. Rather, the prosecutor emphasized that the two men fought over Madrid and that Williford cursed at Pellecier's mom. Pellecier and his mother both testified to this evidence. (*Id.*, Ex. E at 217-20, Ex. D at 117-18.) Pellecier contends it was crucial that the jury hear this evidence from Gonzales, an independent witness. Gonzales is arguably not independent as she was Pellecier's girlfriend at the time. Further, her proposed testimony would have served primarily to establish that Pellecier perceived Williford as the aggressor. That was evident from the testimony of Pellecier and his mother.

Pellecier argues that this evidence was critical because the prosecution tried to show that he decided in advance to murder Williford, which was the premeditation element of first degree murder. This argument is premised on an inaccurate perception of how this evidence was used at trial. The prosecutor talked about the conversation in general not just Madrid's testimony that he threatened to shoot. He used it to show that Pellecier knew who Williford was and that they had an interest in the same girl. (*Id.*, Ex. A at 120-21.) In closing argument, the prosecutor did not even mention the threat, rather, he talked only about the phone call in general and Pellecier being upset that Williford cursed at his mom. (*Id.*, Ex. F at 27, 32, 86.) More importantly, the prosecution argued that the phone call evidenced Pellecier's motive for the murder not premeditation. This is critical because premeditation is an element of the crime while motive is not.

Based on the above, if counsel had interviewed Madrid and presented the testimony of Gonzales there is not a reasonable probability the verdict would have been different. Therefore, the state courts' denial of this claim was not objectively unreasonable.

**Claim 6**

Pellecier alleges he was denied the right to effective assistance of counsel at trial because counsel failed to interview Domingo Pacho and the three female eyewitnesses, Corina Ramos, Kedi Clement and Margaret Kortright, and prepare Petitioner to testify.

The PCR court found that counsel's representation was deficient because he failed to conduct any pretrial interviews. (*Id.*, Ex. U at 1.) The court concluded, however, that there

was not a reasonable probability the outcome of trial would have been different but for

counsel's errors. (*Id.* at 2.) In particular, the PCR court noted that the witnesses' pretrial

statements were not significantly different than their testimony and the State presented a

"great quantum" of evidence against Pellecier. (*Id.*)

> Pacho
>
> Specific to Pacho, the court found:
>
> a. Trial counsel testified that there was not a need to interview Sonny Pacho. He further testified that Mr. Pacho's testimony was favorable to the defense. Trial counsel did testify that he should have emphasized at trial that he had not coached Mr. Pacho. Mr. Cooper testified that it was critical for Mr. Pacho to be effective and credible. He testified that trial counsel should have insured that Mr. Pacho reviewed his statement prior to trial. The Court FINDS trial counsel made a tactical decision not to interview and prepare Mr. Pacho and that Petitioner has not established that he has been prejudiced by this alleged deficiency.

(*Id.*, Ex. U at 6.)

Pellecier argues that because Pacho was not prepared by defense counsel his

testimony did not appear credible. On cross-examination by defense counsel, Pacho testified

that he yelled out to Pellecier that one of the truck passengers had a gun. (*Id.*, Ex. C at 184.)

On re-direct the prosecution questioned why Pacho did not mention that fact during direct

examination, to which Pacho responded that the prosecutor hadn't asked him. (*Id.* at 194.)

The prosecutor also brought out that Pacho had reported that information to the police. (*Id.*)

During closing argument, the prosecutor argued that Pacho had a motive to be dishonest to

the police and in his trial testimony so as not to implicate himself as an accomplice in the

crime. (*Id.*, Ex. F at 83.) Specifically, the prosecutor argued that Pacho did not remember

telling the police that he warned Pellecier about a gun because it was a fact that he made up.[11]

(*Id.* at 84.) Pellecier contends Pacho's testimony, that he and Pellecier were in fear of being

shot or run over, was undermined by the prosecutor's questioning of his credibility.

Pellecier does not allege that Pacho testified contrary to his statement to police nor

---

[11]    Pellecier argues that other witnesses also testified to this warning given by Pacho. The only testimony he cites is that of Kortright – she heard Pacho say, "get the gun, get the gun." (Doc. 62, Ex. E at 103.)

that his testimony was different than expected by defense counsel. Pellecier points to no information counsel would have learned by conducting a pretrial interview. He argues that counsel should have provided Pacho a copy of the statement he made to police. The prosecutor did not elicit the information about the gun on direct because it was not helpful to his case, and preparation of Pacho would not necessarily have led to Pacho volunteering it during his testimony. Counsel asked the necessary question to elicit this information on cross-examination and Pacho agreed, without having to refresh his recollection, that he had yelled a warning to Pellecier about a gun. Pellecier has failed to demonstrate a reasonable probability that the outcome would have been different if counsel had interviewed Pacho. It was not objectively unreasonable for the PCR court to find that Pellecier was not prejudiced.

<u>Ramos, Clement and Kortright</u>

Pellecier argues that if counsel had interviewed and prepared witnesses Ramos, Clement and Kortright, he could have drawn the sting to explain why two of the witnesses lied in their initial statement to the police, and he could have advised them on appropriate attire for their court appearance.

With respect to the three female eyewitnesses, the Court concluded:

b.  Trial counsel testified that he did not recall whether or not he had interviewed Corina Ramos, Kedi Clement and Margaret Kortright. He further testified that he did not discuss with them how to dress because they may have appeared phony. Ms. Cata testified that unless there are excellent police interviews she generally interviews civilian witnesses. She further testified that if a defendant or a witness appears staged, it looks very bad to the jury. Ms. Cata also testified that she does not prepare witnesses, but that she knows what a witness will say and discusses problems with the testimony with the witness. The Court FINDS counsel made a tactical decision so that his witnesses would not appear phony or appear that he had put words into their mouths and that Petitioner has not established that he has been prejudiced by this alleged deficiency.

c.  Mr. Cooper testified that trial counsel should have "drawn the sting" of these witnesses' testimony so that the jury wouldn't be surprised. Ms. Cata testified that whether or not to "draw the sting" depends on the situation. The Court FINDS trial counsel made a tactical decision and that Petitioner has not established that he has been prejudiced by this alleged deficiency.

(Doc. 62, Ex. U at 6.)

Trial counsel testified that the three women were dressed provocatively when they

came to Court, which was harmful to his case. (*Id.*, Ex. Q at 110, Ex. R at 9-10.) Despite counsel's acknowledgment that this was not helpful, Pellecier has not demonstrated a reasonable probability that if the witnesses had dressed more conservatively he would not have been convicted. As found by the PCR court, if counsel had advised the witnesses about their appearance, they might have looked phony to the jury. At a minimum, it was not objectively unreasonable for the PCR court to find that Pellecier was not prejudiced by the witnesses' dress.

As recognized by the PCR court, the witnesses' testimony was not a surprise to defense counsel, nor was it significantly different from their pretrial statements. Pellecier does not argue otherwise. Therefore, he does not allege that counsel would have learned critical information that would have altered their trial testimony if he had conducted interviews.

The remaining question is whether there is a reasonable probability the outcome would have been different if counsel had drawn the sting on the witnesses' lies. This Court defers to the PCR court's factual finding that counsel made a strategic decision not to do so. *See Wood v. Allen*, 130 S. Ct. 841, 849 (2010) (citing 28 U.S.C. § 2254(d)(2)).

The Court finds, further, that the decision was within reasonable professional judgment. Kortright did not lie to the police, so there was no sting to draw with respect to her testimony. Ramos and Clement initially told the police that they were present at the McDonalds but went home and did not witness the shooting. (*Id.*, Ex. E at 67, 69, 148, 157.) They did not lie about the critical events of the shooting because their initial statement was that they did not witness the shooting. When they admitted to having witnessed the shooting, their statement to the police was consistent with their trial testimony. On re-direct counsel attempted to rehabilitate Ramos, emphasizing that she told the police that the truck tried to hit Edwin, which is what she testified to at trial. (*Id.* at 93.) Counsel brought out that Ramos and Clement corrected their statement to the detective in the same conversation, within a thirty-minute time period. (*Id.* at 177-78.) Further, Ramos and Clement acknowledged they lied to the police but stated they were being honest in their trial testimony. (*Id.* at 93, 178.)

Defense counsel clarified with Ramos that he had never contacted her nor told her what to say. (*Id.* at 93.) It was within reasonable judgment for counsel to present their testimony without addressing their initial false statements. This allowed their testimony to be concise and focused on what counsel considered important. Further, he conducted some rehabilitation on re-direct, clarifying how quickly they came forward with an accurate story and informing the jury that he had not shaped their testimony. Based on the above, it was not objectively unreasonable for the PCR court to determine that Pellecier was not prejudiced.

Pellecier

With respect to the allegation that counsel failed to prepare Pellecier for his testimony, the PCR court found:

> Trial counsel testified that, in preparing the defense in this case, he focused on the self-defense theory but, as with most self-defense cases, his main concern was how Petitioner presented himself to the jury. The interview of trial counsel indicates that he informed Petitioner that the prosecutor would try to antagonize him. Additionally, trial counsel testified that, prior to the time that Petitioner took the stand during trial, he did not have any reason to believe that Petitioner would appear arrogant. Trial counsel testified that Petitioner did not appear inappropriate when he testified during the suppression hearing and was always polite when communicating with trial counsel. Trial counsel testified that Petitioner communicated differently to the jury than how he had communicated to trial counsel during pre-trial discussions. The Court FINDS Petitioner has not established that trial counsel was ineffective in his preparation of Petitioner's testimony.

(Doc. 62, Ex. U at 5-6.)

Pellecier argues that he appeared argumentative or arrogant in his trial testimony because counsel did not adequately prepare him to testify. Pellecier does not contend anything about his testimony would have been different with additional preparation, other than his style of presentation. The PCR court relied on testimony of trial counsel that he was focused on how Pellecier would appear to the jury, that he warned him the prosecutor would try to antagonize him, and that he had no reason to believe Pellecier would present poorly based on his experience in meetings and at the suppression hearing. Thus, counsel had no reason to believe that Pellecier would respond with a detrimental attitude when antagonized. Counsel was cognizant that Pellecier's presentation was critical and, based on his experience with Pellecier, counsel acted with reasonable professional judgment in his preparation of

him. It was not objectively unreasonable for the PCR court to find that counsel's performance was not deficient.

The entirety of Claim 6 is without merit.

**Claim 7**

Petitioner alleges his right to effective assistance was violated by trial counsel's decision to present a good character defense. The PCR court denied this claim, finding:

> Trial counsel testified that he spoke with Petitioner's parents prior to trial, but that Petitioner's father nonetheless unexpectedly was very emotional on the stand. Trial counsel further testified that he had so much confidence in the family that, despite problems, he determined that the best choice was to present character evidence. Trial counsel was not able to recall if he spoke with other character witnesses prior to trial, but that he had received information regarding them from letters and from Petitioner's father. Mr. Daniel Cooper, expert for Petitioner, testified that routinely character witnesses obtained from a defendant are not helpful and may actually hurt the case. However, Ms. Alicia Cata, expert for the State, testified that Petitioner's background was not bad compared to most defendants. Although she may not have followed the same strategy, Ms. Cata testified that a character defense can certainly help in a self-defense case. The Court FINDS trial counsel was not ineffective in this determination of trial strategy. Additionally, positive testimony about Petitioner was presented at trial by the character witnesses; and the Court FINDS Petitioner has not established that the result would have been different if trial counsel had not decided to present a character defense. Although this character evidence may have hurt the defense by allowing the State to introduce negative evidence about Petitioner's character, the State's case against Petitioner was strong. The Court FINDS Petitioner has failed to show that he was prejudiced by this alleged deficiency.

(Doc. 62, Ex. U at 3-4.)

First, the Court reviews the state courts' factual finding that trial counsel made a strategic decision and assesses whether that finding was objectively unreasonable. *See Wood*, 130 S. Ct. at 849 (citing 28 U.S.C. § 2254(d)(2)). Pellecier does not dispute that counsel made a strategic decision, and that finding is well-supported by the testimony of counsel upon which the PCR court relied. Instead, Pellecier argues that it was not a reasonable decision.

Next, the Court must review the objective reasonableness of the state courts' ruling that counsel's strategic decision fell within reasonable professional judgment under *Strickland*. *See id.* at 850-51 & n.3. The character witnesses provided both positive and negative testimony about Pellecier, and counsel was aware they would do so before choosing

to present the evidence None of the character witnesses had prior convictions or impeachable material in their background, and they held or had long careers in respectable jobs. (Doc. 62, Ex. T at 21.) Counsel testified that he had a lot of confidence in the family despite some of the negative things to which they would have to testify, and he thought it was best to use their testimony. (*Id.*, Ex. Q at 104.) Further, he felt that Pellecier came from a good family in Oro Valley and he wanted to distinguish him from the prejudices that jurors would apply to people in South Tucson and typical persons out at 3:00 a.m. (*Id.*, Ex. Q at 115-16, Ex. S at 24-25.) He considered the weaknesses of such a defense and thought it was a good approach to the case. (*Id.*, Ex. Q at 115.) Counsel acknowledged that he has "gotten burned" using a character defense in the past because of the evidence the prosecution is allowed to introduce in response. (*Id.*, Ex. S at 27-28.) Further, he has wondered if he made a bad decision to use a character defense in Pellecier's case because some of the evidence was damaging. (*Id.* at 30, 33.)

The court's examination of counsel's conduct "must be highly deferential," there is a strong presumption that counsel's conduct was reasonable. *Strickland*, 466 U.S. at 689. As evidenced by Ms. Cata's testimony that a character defense can be helpful in a self-defense case, even though she might not have made that choice, effective assistance can be provided in many different ways in any given case. *Id.* Counsel was aware of the pros and cons of putting on the character evidence and weighed them prior to making his decision. Counsel had positive testimony to present and credible witnesses. "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420 (2009). At a minimum, it was not objectively unreasonable for the state court to conclude that counsel's decision was within the parameters of reasonable professional judgment.

The focus of Pellecier's argument is that he was prejudiced by counsel's decision. As found by the PCR court, the presentation of a character defense led to the admission of negative evidence regarding the defendant's character. Petitioner relies upon four pieces of

evidence that he contends were otherwise inadmissable but for the presentation of a character defense. The Court summarizes the evidence from the testimony Pellecier cites, which provides a different characterization than that offered by counsel. First, Madrid testified that she had seen Petitioner under the influence of a drug (rochas) and that he acted like a different person who didn't care and she was concerned for her safety. (Doc. 62, Ex. C at 129, 132.) Second, Petitioner had some writings on a notebook in his bedroom referencing a gang. (*Id.*, Ex. D at 81-86, Ex. E at 254-59.) Third, Petitioner and his father disagreed about Pellecier owning a gun because his father did not want it in his home. (*Id.*, Ex. D at 68-81.) Fourth, Petitioner and his mother had a dispute about him using the car and the police were contacted. (*Id.* at 118-22.)

Pellecier overstates this evidence by arguing that it portrayed him as a "violent, mother-beating, drug-addicted, gangster." (Doc. 42 at 48.) There was no testimony from these witnesses about violent behavior, other than his decision to own a gun, which his father said was because he wanted to practice shooting. The evidence did not indicate the dispute with his mother was anything other than verbal. One witness indicated she knew that Pellecier had taken drugs on one occasion. Further, there was no clear evidence that Pellecier was a gang member nor was there any testimony that the murder was in any way gang related. Pellecier and his parents testified that he was not in a gang although he had friends that were gang members. (Doc. 62, Ex. D at 85-86, 121, Ex. E at 257-58.) In sum, the testimony indicated he had disagreements with his parents, wanted to own a gun, associated with gang members and used drugs at least once.

As discussed above with respect to miscarriage of justice, there was more than sufficient evidence to convict Pellecier of first-degree murder. He was not convicted because of a character assassination, rather, the jury did not accept his self-defense claim, which was refuted by significant other evidence. Therefore, it was not unreasonable for the state court to conclude that Pellecier was not prejudiced by the presentation of a character defense. Claim 7 is without merit.

**Claim 9**

Petitioner contends his right to due process was violated because there was insufficient evidence of his guilt. In particular he argues he was justified in firing his gun and there was not sufficient evidence of premeditation. This claim was raised and denied on direct appeal:

> To show premeditation by a defendant, the state must prove the defendant "made a decision to kill prior to the act of killing, that 'a plan to murder was formed after the matter had been made a subject of deliberation and reflection.'" . . . Premeditation can be shown by circumstantial evidence.
>
> In a statement to the police after the shooting, the passenger in Pellecier's vehicle said that, while Pellecier's vehicle was pursuing W.'s vehicle, Pellecier had said he would "get" W. in retaliation for W.'s having cursed at Pellecier's mother during a telephone conversation. Pellecier testified that he had deliberately retrieved his weapon from his vehicle and fired it. When viewed in the light most favorable to sustaining the conviction, this evidence was sufficient for reasonable people to find Pellecier guilty of premeditated murder. . . . Whether Pellecier had acted in self-defense is a different matter, . . ., which the jury apparently decided against him.

(Doc. 62, Ex. BB at 9-10.)

On habeas review, the "rational factfinder" standard is used to determine whether there is sufficient evidence to support a state court's finding of the elements of the crime. *See Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A habeas court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id*. at 326; *see also Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (per curiam). This type of claim is properly analyzed under the deferential standard of § 2254(d)(1); thus, the Court asks whether it was an objectively unreasonable application of *Jackson* for the Arizona Court of Appeals to deny this claim. *See Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir.), *vacated in part on other grounds*, 503 F.3d 822 (9th Cir. 2007).

1   Pellecier relies on arguments set forth in other parts of his brief to establish that he
2   acted in self defense and, therefore, there was insufficient evidence to convict. Further, he
3   contends there was insufficient evidence of premeditation. He fails to articulate his argument
4   specific to this claim limited only to trial evidence.

5   Under Arizona law, premeditation requires that the defendant act with either the
6   intention or knowledge that he will kill another human being, when such intention or
7   knowledge precedes the killing by a length of time to permit reflection. A.R.S. § 13-1101(1).
8   In this case, the Arizona Court of Appeals relied on two pieces of evidence for premeditation:
9   Pacho's testimony that Pellecier stated he was going to get Williford while he pursued him
10  in his car, and Pellecier's testimony that he intentionally retrieved his gun and fired it at the
11  truck. (Doc. 62, Ex. Z at 9-10.) A rational trier of fact could conclude that this evidence
12  presented at trial established premeditation.

13  Further, a rational juror could conclude that Pellecier was not acting in self-defense
14  or defense of Pacho at the time he fired his gun. A reasonable juror could have concluded
15  that Pellecier provoked the use of force by Williford, which negates a justification defense.
16  Three witnesses testified that Pellecier got out of the car with a gun in his hand.
17  Alternatively, Pellecier testified that he retrieved his gun later, at which point he was not in
18  fear of being struck by the truck. (*Id.*, Ex. E at 249.) Because any apparent danger from the
19  truck had passed, there was no justification for the use of deadly force. Next, a rational finder
20  of fact could have concluded that a reasonable person would not have believed deadly force
21  was immediately necessary based on a person in the truck possessing a gun. Pacho and
22  Pellecier both testified they thought Gutierrez had a gun because he reached for his pants but
23  neither stated they ever saw a gun or that he threatened them with it. Gutierrez quickly got
24  back in the truck. All of the passengers in the truck testified that no one in the truck had a
25  gun. Under those circumstances a rational juror could find that a reasonable person was not
26  justified in the use of deadly physical force.

27  Based on the foregoing, the state court's conclusion that there was sufficient evidence
28  to support a guilty verdict for first degree murder was not contrary to or an unreasonable

application of clearly established federal law. Petitioner is not entitled to relief on Claim 9.

**MOTION FOR EVIDENTIARY HEARING**

Pellecier requests an evidentiary hearing as to Claims 1, 3, 5, 6, 7, 9 and 10. Because the Court found Claim 10 untimely, it does not discuss Petitioner's request for a hearing on that claim.

The availability of an evidentiary hearing in federal court is sharply constrained by the recent decision of *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011): "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." Pellecier does not contest that *Pinholster* bars an evidentiary hearing on all but Claims 1 and 3. The Court cannot hold a hearing on Claims 5, 6, 7 or 9 because they were adjudicated on the merits in state court and, as discussed above, Pellecier has failed to satisfy (d)(1). Pellecier also fails to assert what evidence, or even what type of evidence, he would present if granted a hearing on these claims. As an additional matter, Claim 9 is necessarily limited to the state court record as the issue it presents before this Court is whether sufficient evidence was introduced at trial to support the guilty verdicts.

Pellecier reiterates his argument that the state court failed to adjudicate a portion of Claim 1 – IAC at trial for failing to investigate the bullet trajectory evidence. The Court disagrees. *See supra* p. 15 & n.4. Thus, the Court is prohibited by the holding in *Pinholster* from holding an evidentiary hearing on Claim 1. Further, despite describing Claim 1 as his primary claim, Petitioner does not indicate what evidence he wants to present at an evidentiary hearing on Claim 1. To the extent he wants to introduce the evidence he developed in the second PCR proceeding, the Court has considered it and finds it does not warrant relief.

Petitioner is correct that the state court failed to consider Claim 3 on the merits; therefore, *Pinholster* does not bar a hearing. At a hearing, Pellecier proposes to present evidence regarding why the State presented erroneous evidence regarding the bullet trajectory and why it violated the rules of discovery. In particular, he wants to present when

Detective Fillipelli disclosed his opinion on the bullet trajectory to the prosecutor and why that was not disclosed to the defendant.

Unlike the usual civil litigant in federal court, a habeas petitioner is not entitled to discovery "as a matter of ordinary course," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999), and a habeas court should not allow a habeas petitioner "to use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United States Dist. Court for the Northern Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970) ("[h]abeas corpus is not a general form of relief for those who seek to explore their case in search of its existence"). Petitioner's assertions that Detective Fillipelli testified falsely and the prosecutor had knowledge of the falsity are entirely speculative without any foundation. Pursuant to *Bracy*, whether a petitioner has established "good cause" for discovery requires a habeas court to determine the essential elements of the petitioner's substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id.* at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The Court determined that the evidence at issue – the trajectory of one of the three bullets – is not material. Because Pellecier is not entitled to relief on this claim based on the allegations before the Court, there is not good cause for discovery or grounds for an evidentiary hearing. *See Silva v. Woodford*, 279 F.3d 825, 853 (9th Cir. 2002) (no hearing required when the allegations, if proven, would not entitle the petitioner to relief).

## CONCLUSION & RECOMMENDATION

Claims 1, 3-7 and 9 do not warrant relief under the AEDPA and should be dismissed on the merits. Claim 2 alleges evidence relevant to Claims 1 and 3, for which it was considered, but does not allege a separate constitutional claim. Claim 8 alleges actual innocence only as a fundamental miscarriage of justice; the Court considered it as such and found that Pellecier did not meet the standard. Claims 10-12 should be dismissed as untimely in violation of the statute of limitations. Based on the foregoing, the Magistrate Judge

1  recommends the District Court enter an order DISMISSING the Amended Petition for Writ of

2  Habeas Corpus (Doc. 42). Additionally, the Magistrate Judge recommends the District Court

3  enter an order DENYING the Motion for Evidentiary Hearing (Doc. 70).

4        Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file

5  written objections within fourteen days of being served with a copy of the Report and

6  Recommendation. If objections are not timely filed, they may be deemed waived. Any

7  objections filed should be captioned with the following case number: **CV-05-159-TUC-FRZ**.

8        DATED this 3rd day of May, 2012.

9

10

11

12

13

14                                    D. Thomas Ferraro
                                 United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28